# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CARLOS TIRADO-NEGRON,    :
          :CIVIL ACTION NO. 3:18-CV-0003
      Plaintiff,    :
          :(JUDGE JONES)
      v.    :
          :
NANCY A. BERRYHILL,    :
Acting Commissioner of    :
Social Security,    :
          :
      Defendant.    :
          :

---

## MEMORANDUM

### December 19, 2018

Pending before the Court is Plaintiff's appeal from the Acting Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. (Doc. 1.)  Plaintiff protectively filed applications on July 7, 2014, alleging disability beginning on February 23, 2013.[1]  (R. 16.)  After Plaintiff appealed the initial November 12, 2014, denial of the claims, a hearing was held by Administrative Law Judge ("ALJ") Patrick S. Cutter on September 2, 2016.  (R. 48.)  ALJ Cutter issued

---

[1]  This action involves Plaintiff's second applications for benefits.  (R. 16.) The applications were filed after the Appeals Council denied Plaintiff's appeal of Administrative Law Judge Lorenzo Level's unfavorable  February 22, 2013, Decision regarding Plaintiff's February 18, 2011, applications for DIB and SSI.  (R. 68-99.)

his Decision on November 16, 2016, concluding that Plaintiff had not been under a disability, as defined in the Act, from February 23, 2013, through the date of the decision. (R. 27.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on December 12, 2017. (R. 1-9.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on January 2, 2018. (Doc. 1.) He asserts in his supporting brief that the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the ALJ did not properly consider listings 12.04 and 12.06; 2) the ALJ did not adequately consider limitations related to Plaintiff's severe impairments; 3) the ALJ did not afford appropriate weight to Plaintiff's treating provider's Mental Residual Functional Capacity Evaluation; 4) the ALJ failed to consider nine diagnosed medical conditions and the related limitations; 5) the ALJ erred by using GAF scores in assessing Plaintiff's residual functional capacity; 6) the ALJ did not consider side effects of medication; and 7) the ALJ did not consider the effects of Plaintiff's bilateral carpal tunnel syndrome. (Doc. 16 at 1-2.) For the reasons discussed below, the Court concludes Plaintiff's appeal is properly denied.

## I. Background

Plaintiff was born on July 29, 1969, and is not able to communicate in English.

(R. 26.)  He has past relevant work as a truck driver and warehouse worker/store laborer.  (R. 25.)  He testified that he completed high school and had not worked at all since February 2013.  (R. 52.)  In a Disability Report dated August 11, 2014, Plaintiff alleged his ability to work was limited by the following: back and neck pain; cardiac arythmia; hypoglycemia; liver disorder; enlargement of lymph nodes; polycythemia familial; headaches; depression; anxiety; wrist, arm, and shoulder pain; and carpal tunnel in both hands.  (R. 250.)

## A.  *Medical Evidence*

## 1.  <u>Mental Impairments</u>

Shortly before the alleged February 23, 2013, onset date, Plaintiff was seen at the Good Samaritan Health System Emergency Center for the chief complaint of fever and was ultimately diagnosed with a viral illness, possibly the flu.  (R. 651-52.) While being evaluated at the December 30, 2012, emergency visit, physical examination included a psychiatric evaluation.  (R. 653.)  The provider found that Plaintiff was cooperative and his speech, mood, and thought process were within normal limits.  (R. 653.)  He again presented on January 2, 2013, with flu symptoms; psychiatric examination indicated Plaintiff was cooperative and his speech was within normal limits.  (R. 646-47.)

Plaintiff was seen at Good Samaritan Family Practice Center numerous times

for multiple physical problems from January 2013 through August 2013. (R. 516-44.) Mental health problems were not indicated at any encounter. (*Id.*) At his August 29, 2013, office visit, Plaintiff was seen for abdominal pain. (R. 516.) Office notes include the Edinburgh Depression Scale where Plaintiff indicated he had not been "bothered by . . . little interest or pleasure in doing things [or] [f]eeling down, depressed or hopeless" in the preceding month. (*Id.*)

Plaintiff had a Psychiatric Evaluation at T.W. Ponessa & Associates on September 27, 2013. (R. 473-75.) Vassili V. Arkadiev, M.D., noted Plaintiff reported he had applied for Social Security and had a lot of physical and mental issues.[2] (R. 473.) "Having a lot of pain" was noted to be Plaintiff's chief complaint. (*Id.*) "History of Present Illness" was described as follows:

> Information was obtained from the patient and to some extent from the chart. The patient reports he was doing really well about five years ago when he had a severe accident in which he injured his right shoulder muscles, developed back pain, and hasn't been able to work since that time. The patient reports over the last five years he has been feeling depressed. He reports constant feelings of hopelessness, helplessness. He reports his concentration and attention may be on and off. The patient says he has been feeling weak. He says he is very desperate because he can't do many things. Although the patient has applied for Social Security he says he is still

---

[2]    Plaintiff's first application for benefits was pending at the time as Plaintiff had requested review of ALJ Level's February 22, 2013, Decision. (R. 68-99.)

> waiting for the decision. He feels very uncomfortable due to the lack of money and his inability to do things that he used to like. The patient hasn't been able to do a lot of things including cooking, or sports activities. He says his appetite is on and off although the patient thinks he might have gained about 30 lbs. over the last few years. He noticed an increase of anxiety. He says, "I worry a lot. I worry all the time." He is mostly worried about what is going to happen to him and about the future of himself and his family. About five years ago, the patient noticed some ideas of thought insertion, thought withdrawal. About two years ago, the patient developed feelings that people are looking at him, somebody may be following him, feeling that strangers may know there is something wrong with him. About a few months ago he started having auditory hallucinations hearing male and female voices inside of his head calling his name. The patient denies recent suicidal or homicidal ideations.

(*Id.*) "Past Psychiatric History" indicates Plaintiff had not been seen by a psychiatrist or had previous psychiatric hospitalizations. (*Id.*) Plaintiff admitted thinking about suicide a year earlier. (*Id.*) He said he did not have any psychiatric history prior to the preceding five years. (*Id.*) He also denied obvious manic episodes but admitted to anxiety. (*Id.*) He reported a lot of problems with pain, including insomnia. (*Id.*) Regarding "Family/Social History," Dr. Arkadiev noted that Plaintiff lived with his girlfriend of nineteen years, their three children, and his "father-in-law," Plaintiff took care of their place, and said he enjoyed swimming, watching TV, playing basketball, and cooking but he had not been able to do any of these things because of severe pain. (R. 474.) Dr. Arkadiev recorded the following Mental Status examination findings:

5

The patient is a 44 year-old, slightly obese, athletically-framed, Hispanic, male. Current weight is 206 lbs. The patient is 5 ft., 8 inches. The patient's manner is cooperative, friendly. The patient has poor eye contact. Speech is soft, monotonous. The patient does comprehend some English but doesn't speak much so an interpreter was present who was translating during the interview. Mood: the patient reports he has a lot of pain. He has a lot of depression and worries. Affect appears to be blunted, depressed, anxious. The patient admits to some pain in his upper extremities, especially on the right side. At times he may have labored breathing when he feels anxious. He admits some Anhedonia. The patient has feelings of hopelessness, helplessness. He reports his concentration and attention are fair. The patient denies suicidal or homicidal ideations. He admits to auditory hallucinations. He admits to ideas of persecution as well as ideas of thought insertion, thought withdrawal. The patient is alert and oriented times two. Long-term memory appears to be fair. Intellect appears to be at least average. Gait is within normal limits. No tremor. No increased muscle tone. The patient has obvious pain in his upper extremities because he can't move his arm as well. No signs of tardive dyskinesia were observed. AIMS is negative. Insight and judgment are fair.

(R. 474.) Dr. Arkadiev's Diagnostic Impression included "Major Depressive Disorder, severe, single episode," Dysthymic Disorder, and a Current GAF score of 50. (*Id.*) Dr. Arkadiev planned to start Remeron to address Plaintiff's sleeping problems, anxiety, and depression. (R. 475.)

At his next visit on October 25, 2013, Plaintiff reported ongoing problems but said he had a decrease in auditory hallucinations, he denied problems with

concentration, and denied confusion. (R. 471.) Mental Status exam was much the same as the preceding month. (R. 471, 474.) Dr. Arkadiev planned in increase the Remeron dosage and add Abilify to address psychotic and depression symptoms. (R. 472.)

In a February 11, 2014, Treatment Plan signed by Dr. Arkadiev and therapist Natalie Rebman, MS, it was noted that Plaintiff had good attendance at treatment, he enjoyed walking and had begun to go the YMCA to help cope with stress and physical problems, and he was going to church regularly to help relieve stress and share with others. (R. 464-65.)

on April 11, 2014, Dr. Arkadiev noted that he last saw Plaintiff in November 2013. (R. 469.) Plaintiff reported that he had not been taking the prescribed medication for some time and he did not remember experiencing significant improvement when he took it. (*Id.*) On Mental Status exam, Dr. Arkadiev reported that Plaintiff's speech and thought process were slowed but coherent; his affect appeared constricted and depressed; concentration and attention were impaired; he admitted paranoid ideations and denied visual hallucinations; he was alert and oriented times two; his long-term memory appeared to be intact; and his insight and judgment were fair to good. (R. 469.) Dr. Arkadiev planned to start new medication to address symptoms of depression and anxiety and noted he would consider adding a

psychotic medication if Plaintiff did not respond well. (R. 470.)

At his May 9, 2014, visit with Dr. Arkadiev, Plaintiff continued to report mental health symptoms but said he thought the medication had started working. (R. 467.) Dr. Arkadiev's Mental Status report included the notation that Plaintiff said his concentration and attention were fair, he denied Anhedonia, denied auditory or visual hallucinations at the moment but reported he still had auditory hallucinations on and off as well as paranoid ideations. (R. 467.) Dr. Arkadiev also found that Plaintiff's speech was soft but within normal limits; his affect appeared constricted and anxious; he was alert and oriented times two; and his insight and judgment were fair to good. (*Id.*)

On September 9, 2014, Dr. Arkadiev noted that Plaintiff reported he was applying for disability and he had been depressed since he suffered a work-related injury. (R. 777.) Plaintiff had been attending outpatient treatment therapy with Ms. Rebman at T.W. Ponessa but he continued to report multiple mental health symptoms and no benefit from prior medication trials. (*Id.*) On Mental Status exam, Dr. Arkadiev found Plaintiff was alert, awake and oriented times four; he was cooperative and slightly anxious; his speech was somewhat fast but non-pressured; his mood was depressed; his affect was constricted and anxious; his thought process was linear and coherent but his thought content showed some signs of paranoid ideation; he denied

psychotic symptoms at the time; cognition and memory were fair to good; and judgment and insight were fair to good. (R. 778.) Plaintiff's Current GAF was assessed to be 50-55. (R. 779.) Dr. Arkadiev adjusted Plaintiff's medication regimen and planned to see him in one month. (R. 780-81.)

At a September 12, 2014, office visit with Weibin Shi, M.D., of the Milton S. Hershey Medical Center, Plaintiff's chief complaint was right neck, shoulder, and arm pain. (R. 682.) He acknowledged anxiety in the Review of Systems. (R. 683.) The psychiatric component of his physical examination indicates Plaintiff was cooperative, had normal judgment, and was non-suicidal. (R. 684.) After noting that he counseled Plaintiff about differential diagnoses and treatment options, Dr. Shi reported that Plaintiff was interactive, attentive, asked questions, and verbalized understanding. (R. 685.)

Plaintiff was seen at Good Samaritan Hospital Emergency Department on October 10, 2014. (R. 732.) Plaintiff presented with a headache and explained he had been with his therapist when he suddenly felt he could not breathe, his vision became white, and he began to feel somewhat better when a door was opened but then became anxious and sweaty. (R. 735.) No additional findings were recorded in the psychiatric portion of the physical exam review. (R. 736.) The Nursing Assessment contained in the October 10, 2014, hospital records indicated that Plaintiff was

oriented to person place and time; "Depressed" and "Anxious" boxes were not checked.  (R. 740.)  The Nursing Assessment also indicated that a possible panic attack was being investigated as the cause of Plaintiff's symptoms.  (R. 739.)

In April 2015, Plaintiff was seen by Robert R. Schade, M.D., at Good Samaritan Digestive Health because of abnormal liver studies.  (R. 835.)  Office records show that Plaintiff denied anxiety and mood changes in the Review of Systems.  (R. 835.)

Plaintiff saw Felicia DeJesus, M.D., at T.W. Ponessa on May 11, 2015.  (R. 763-64.)  Plaintiff reported that he continued to struggle with depressive symptoms, and he admitted that he was not taking medication consistently.  (R. 763.)  Dr. DeJesus advised Plaintiff that the best therapeutic outcome could not be reached if Plaintiff did not take medications as prescribed, and she would be unable to help him if he did not adhere to the recommended treatment.  (*Id.*)  Mental Status exam showed the following: Plaintiff was alert, awake, and oriented times four; he was calm and cooperative; he had fair eye contact; his speech was within normal limits; his mood was depressed; his affect was reactive, close to euthymic, incongruent; his thought process was coherent and linear; his thought content demonstrated no signs of delusions; he admitted to some paranoid ideation and auditory hallucinations of hearing his name being called; cognition and memory were fair; long-term memory

was grossly intact; and his judgment and insight were fair to poor. (R. 764.) Dr. DeJesus planned to continue Plaintiff's medication regimen and noted that she encouraged Plaintiff to adhere to the plan and follow a healthy diet and exercise. (*Id.*)

On August 24, 2015, Dr. DeJesus again saw Plaintiff for follow-up. (R. 783-84.) Plaintiff reported that he was taking his medications daily. (R. 783.) Other than auditory hallucinations of hearing his name being called at nighttime and sleep problems, Plaintiff raised no other issues or complaints. (*Id.*) A medication adjustment was agreed upon to target these symptoms. (*Id.*) Dr. DeJesus noted that Plaintiff remained engaged in individual psychotherapy with Ms. Rebman. (*Id.*) Mental Status exam showed that Plaintiff was calm and cooperative; his speech was within normal limits; his mood was "okay"; his affect was reactive and slightly constricted; his thought process was coherent and linear; his thought content showed no signs of delusions; he admitted to some paranoid ideation and auditory hallucinations; his cognition and memory were fair; long-term memory was grossly intact; and judgment and insight were fair to poor. (*Id.*) Dr. DeJesus adjusted Plaintiff's medication regimen and advised him to adhere to all aspects of his therapy plan. (R. 784.)

Plaintiff again denied psychiatric symptoms to Dr. Al-Noor on October 7, 2015. (R. 843.)

Plaintiff presented at the Good Samaritan Hospital Emergency Department on November 16, 2015, for evaluation of sharp lower back pain which had begun shortly before he arrived after he lost his balance and fell. (R. 898.) No psychiatric problems were reported in the Review of Systems or physical examination psychiatric section. (R. 898.)

## 2. Shoulder and Neck Impairments

Good Samaritan Family Service Practice provider Daniel T. Mateer, M.D., saw Plaintiff on February 23, 2013, for follow-up of neck pain related to a work injury. (R. 536.) Dr. Mateer noted Plaintiff had gone to physical therapy for the problem but did not complete it because Plaintiff said it did more harm than good. (*Id.*) Review of studies indicated an April 12, 2012, cervical x-ray showed minimal changes (1.6 mm anterior listhesis of C4 over C5 without dynamic instability); MRI of the cervical spine on April 18, 2012, showed mild, multi-level degenerative changes with no significant canal or foraminal stenosis; June 14, 2012, EMG showed very mild, left median mononeuropathy at wrist, no electrodiagnostic evidence of a superimposed cervical radiculopathy or brachial plexopathy affecting either upper limb; and December 16, 2012, MRI of the right upper extremity showed mild subacromial bursitis. (R. 536-37.) Examination showed right cervical muscle tenderness to palpation, marked weakness of both upper extremities on exam, Phalen test

subjectively positive right greater than left, and Tinel test positive.  (R. 537.)

Regarding cervicalgia, Dr. Mateer planned to reassess Plaintiff after he saw his

neurosurgeon but he would probably plan for cognitive behavior therapy, SSRI,

NSAIDs, and consideration of return to physical therapy.  (R. 538.)

Plaintiff was seen by Isabella Ahanogbe, M.D., at Good Samaritan Family

Practice Center in April 2013 for MRI follow-up.  (R. 531.)  Physical exam showed

right cervical paraspinal tenderness and weakness present in the bilateral upper

extremity exam.  (R. 532.)  Plaintiff was taking Gabapentin for pain and reported that

the nature of the pain had not changed.  (R. 531.)  He was advised that nothing more

could be done until he talked with other specialists involved in his care about their

plans/recommendations for him.  (R. 532.)

In June 2013, Dr. Mateer saw Plaintiff for follow-up on MRI results.  (R. 525.)

Office records indicate Plaintiff reported that his neck and right shoulder pain had not

changed, and he continued to have weakness in his right upper extremity and tingling

in his right hand.  (R. 525.)  Dr. Mateer noted that Plaintiff's spinal surgeon, Dr.

Kuhlengel, had decided to stop seeing Plaintiff and referred him to neurology at

Hershey Medical Center ("HMC").  (*Id.*)  He added "Dr. Kuhlengel as per his note

states that the patient's physical exam is normal except for suboptimal effort on the

patient's part on examination of motor strength.  All nerve conduction studies appear

to be normal." (*Id.*)  Dr. Mateer also noted Plaintiff had been seen by "HMC Orthopedia who had ordered an MRI of his right shoulder and there was no rotator cuff tear but instead there is just some minor degenerative changes." (*Id.*)  Plaintiff was scheduled for follow-up at HMC Neurology on July 12, 2013, and HMC Orthopedia for adhesive capsulitis on June 21, 2013.  (*Id.*)  Physical exam showed neck tenderness on palpatioin of the cervical musculature, posterior neck, midline of the neck and both sides of the neck; musculoskeletal exam showed right upper extremity range of motion  apparently diminished with a "poor effort to move upper extremity while examining."  (R. 526.)  Dr. Mateer stated it was difficult to assess whether Plaintiff "was malingering on examination today but the patient did mention at various times during the encounter that his case is being examined by lawyers to see if there is enough 'evidence' for disability."  (*Id.*)

Plaintiff saw Robert A. Gallo, M.D., of HMC on July 5, 2013, for right shoulder pain follow-up.  (R. 434-35.)  Dr. Gallo noted that Plaintiff reported no pain relief with medication management, injections, or physical therapy.  (R. 434.)   He found right-shoulder tenderness to palpation over the AC joint and anterior joint line, and limited active range of motion in all directions.  (*Id.*)  Dr. Gallo noted that x-rays and MRI of the right shoulder demonstrated degenerative changes of the glenohumeral joint and intact rotator cuff tendons.  (*Id.*)   He assessed that Plaintiff was not a

candidate for total shoulder replacement because of his age and he was unlikely to gain significant pain relief from a hermiarthroplasty given the involvement of the glenoid on MRI.  (R. 434-35.)  Dr. Gallo noted he had no other treatments for Plaintiff and his recommendation was for Plaintiff to continue with pain management.  (R. 435.)

When Plaintiff saw Dr. Shi at HMC for neck, shoulder, and arm pain on September 12, 2014, he reported continuing pain and frustration that he had minimal relief with medications and other treatment.  (R. 682.)  Musculoskeletal exam showed limited range of motion of the cervical spine with pain on range of motion, tenderness of the left paraspinal muscle, trapezius, and periarticular of right shoulder; and positive impingement of rotator cuff with limited range of motion of right shoulder. (R. 684.)  Dr. Shi diagnosed the following: bursitis, subacromial/subdeltoidal; rotator cuff impingement syndrome; cervical myofascial pain syndrome; pain of cervical facet joint; shoulder pain; arm pain; neck pain; carpal tunnel syndrome.  (R. 684-85.)  Dr. Shi administered injections and recommended physical therapy and home exercises.  (R.  685.)  In his summary, Dr. Shi noted that Plaintiff

> seems under lots of stress and frustrated recently due to worsening situation with minimal resource availablility for his condition.  I think he has organic pathology, most of which are myofascial, however, his psychological condition may adversely affect his pain signal processing.  I did perform a right subacromial injection,

> trigger point injection aborted due to dizziness and
> anxiety. It is important for him to understand that he still
> needs to start physical therapy or home exercise for his
> shoulder mobility and pain relief if the pain is tolerable.

(R. 685.) Dr. Shi added that Plaintiff verbalized understanding. (*Id.*)

At a March 25, 2015, Good Samaritan Oncology and Hematology consultation for polycythemia, Plaintiff's complaints included headaches, neck and arm pain as well as recent vomiting, diarrhea, stomach upset, and possible fever. (R. 830.) Physical exam of the neck revealed no lymphadenopathy or other problems, and examination of the extremities showed 5/5 motor strength bilaterally. (R. 831.) The provider, Neenos Abd Al-Noor, M.D., noted that Plaintiff continued to have polycythemia, phlebotomy was not helping him so he would stop it, and the condition was secondary to obesity and sleep apnea. (R. 834.) Dr. Al-Noor planned to arrange a sleep study and directed Plaintiff to return in six months. (*Id.*)

On April 9, 2015, Plaintiff was seen at Good Samaritan Digestive Health because of abnormal liver studies. (R. 835.) Office records show that Plaintiff denied musculoskeletal symptoms in the Review of Systems. (R. 835.) Neck examination was normal to palpation; musculoskeletal examination showed that both upper and lower extremities were normal to inspection and palpation. (R. 836.)

In October 2015, Plaintiff was again seen at Good Samaritan Digestive Health Plaintiff described his energy level as normal, denied arthralgias, stiffness, and

swelling, denied headache, and denied anxiety and mood changes. (R. 855.) Physical exam showed neck normal to palpation; normal gait; upper and lower extremities normal to inspection and palpation, and motor strength 5/5 bilaterally. (R. 856.)

On November 16, 2015, Plaintiff presented at Good Samarital Hospital Emergency Department complaining of sharp lower back pain with an onset just prior to arrival when he bent to pick something up, lost his balance, and fell on his right side. (R. 897.) Review of systems was negative except for lower back pain. (*Id.*) Physical exam showed no problems other than diffuse tenderness of the lumbar spine, tenderness of the paralumbar musculature, and mild spasm. (R. 898.) Plaintiff was diagnosed with lumbosacral strain and released with instructions to ease the pain and follow up with his family practice provider. (R. 894-96.)

At his Digestive Health Specialists visit on April 22, 2016, Plaintiff again denied arthralgias, stiffness, and swelling, denied headache, and denied anxiety and mood changes. (R. 881.) Neck, musculoskeletal, and neurogologic exams were the same as previously recorded. (R. 836, 856, 882-83.)

Plaintiff was treated at Good Samaritan Hospital Outpatient Physical Therapy Services in July 2016. (R. 917-20.) He was referred for neck pain and bilateral shoulder pain. (R. 917.) His chief complaints were neck pain, bilateral shoulder pain, bilateral carpal tunnel pain, with bilateral upper extremity paresthesias with sleep.

(*Id.*) By history, the neck and right arm pain started five years earlier, and the left shoulder pain started three months earlier. (*Id.*) He also reported arthritis, depression, and right carpal tunnel surgery five months earlier. (*Id.*) Plaintiff said the surgery had not been helpful. (*Id.*) He specifically complained of left shoulder pain from the trapezius region to the mid arm, neck pain extending into his right upper trapezius to his right mid arm, paresthesias with sleep only, pain symptoms aggravated with sitting, carrying items, lifting, and activity in general. (*Id.*) He said he got some relief from symptoms with medication but nothing else had been helpful. (*Id.*) Plaintiff was tender to palpation in the areas complained of, he showed pain with range of motion, his muscle performance was 7 pounds on the right and significant pain at 10 pounds and 18.6 pounds on the left with slight pain at 21.7 pounds; left shoulder was 4/5 with significant pain; left elbow 4/5 with increased pain; right shoulder 3+/5 with significant pain; right elbow 4-/5 with increased pain. (R. 918.) The provider noted that Plaintiff needed skilled physical therapy intervention due to limited range of motion throughout the neck and bilateral shoulders, elevated pain levels through same, and reduced strength through both upper extremities. (*Id.*) Plaintiff's rehab potential was assessed to be fair due to multiple joint involvement and the prolonged period of time involved. (R. 919.) Plaintiff's pain was slightly reduced after his July 29th session. (*See* R. 930.)

18

### 3. **Carpal Tunnel Syndrome**

In the MSH August 29, 2014, Outpatient Note, Dr. Gallo recorded that Plaintiff had "most recently" been treated by Dr. Ingraham for carpal tunnel syndrome.  (R. 688.)  Dr. Gallo did not record any related findings on objective exam.  (*Id.*)

In December 2015, Plaintiff was seen at Good Samaritan Surgical Associates for bilateral carpal tunnel syndrome.  (R. 869-72.)   No physical exam findings were recorded.  (*See id.*)

## B. *Opinion Evidence*

On October 31, 2014, Sandra Banks, Ph.D., a State agency consultant, completed a Psychiatric Review Technique ("PRT") and opined that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration.  (R. 116.) Dr. Banks also completed a Mental Residual Functional Capacity Assessment in which she found that Plaintiff had no limitations in six of the eight concentration and persistence categories and he had moderate limitations in the remaining two--he was moderately limited in his ability to carry out detailed instructions and his ability to maintain attention and concentration for extended periods.  (R. 118.)  She opined that Plaintiff had limitations in two of the five social interaction categories--he was

moderately limited in his ability to interact appropriately with the general public and his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (*Id.*)  Regarding adaptation limitations, Dr. Banks found that Plaintiff was limited in one of four categories--he had moderate limitations in his ability to respond appropriately to changes in the work setting.  (R. 119.)  In her narrative explanation, Dr. Banks provided the basis for her limitation determinations and conclusion that Plaintiff would be capable of performing simple tasks, including the observation that treatment notes did not support a thought disorder although Plaintiff reported intermittent "'voice', underlying paranoia."  (*Id.*)  She also noted that August 27, 2012, Hershey treatment notes indicate Plaintiff reported his medication caused rare auditory hallucinations.  (*Id.*)

On December 24, 2014, T.W. Ponessa therapist Natalie Rebman completed a Mental Residual Functional Capacity Assessment Form.  (R. 717-20.)  She diagnosed Plaintiff with major depressive disorder, recurrent and severe, and with psychotic features, and with anxiety disorder.  (R. 717.)  She assessed Plaintiff's GAF to be 50 at the time, with 50-55 assessed to be the highest GAF of the year.  (*Id.*)  She opined that Plaintiff's medical issues--including shoulder, neck and carpal tunnel problems-- may have contributed to Plaintiff's mental impairments.  (*Id.*)  Ms. Rebman found that Plaintiff had at most mild limitations in understanding and memory.  (R. 718.)

Regarding sustained concentration and persistence, she opined that Plaintiff had no limitations in carrying out very short, simple instructions; mild limitations in carrying out detailed instructions; moderate limitations in his ability to maintain attention and concentration for extended periods; marked limitations in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; no limitations in his ability to sustain an ordinary routine without special supervision; mild limitations in his ability to work in coordination with or proximity to others without being distracted by them; no limitations in his ability to make simple work-related decisions; and moderate limitations in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of and length of rest periods. (R. 718-19.) In the five categories of social interaction, Ms. Rebman concluded Plaintiff had no limitations in two areas, two areas of mild limitation, and a moderate limitation in his ability to accept instructions and respond appropriately to criticism from supervisors. (R. 719.) She found that Plaintiff's adaptation abilities were limited in only one of five categories, i.e., he had marked limitations in this ability to tolerate normal levels of stress. (R. 719-20.) Ms. Rebman opined that Plaintiff's impairment would substantially interfere with his ability to work on a regular and sustained basis 20% of the time and he would

miss five to ten days a month because of his mental impairment.  (R. 720.)

## C. *Function Report and ALJ Hearing*

### 1.  Function Report

In a September 2014 Function Report, Plaintiff said his ability to work was limited due to daily pain in his arm, neck, back, and hands, migraine headaches, occasional stomach pain, depression, anxiety, and panic.  (R. 270.)  He indicated that many personal care activities were affected by his problems, and he did not do household chores or yard work.  (R. 271-72.)  Plaintiff said he went out only for appointments every two weeks and he tried to go to church on Sundays if he felt well enough.  (R. 273, 274.)  He indicated he had difficulty with the following: lifting, squatting, bending, reaching, kneeling, memory, completing tasks, concentration, understanding, following instructions, and using his hands.  (R. 275.)  He also said he had a brace/splint for his hands which he used when he felt pain.  (R. 276.)

### 2.  ALJ Hearing

Plaintiff's attorney identified psychiatric problems as the most limiting of Plaintiff's many alleged physical and mental conditions.  (R. 51.)  He also specifically noted that  Plaintiff's neck problems, right shoulder problem, and carpal tunnel syndrome had been found to affect functioning and exasperate the mental-health disorders.  (R. 52.)

Plaintiff testified at the September 2, 2016, ALJ Hearing, that he was seeing his

therapist monthly but had previously seen him biweekly.  (R. 53.)  He said he had side effects from medications but he was unable to remember what problems the medications caused.  (*Id.*)  In the course of his medication response, Plaintiff noted that he had hallucinations, he got very hyper, he had anxiety, and he needed to go the bathroom every time he took one of his medications.  (*Id.*)  Plaintiff verified that he had hallucinations frequently and substantively explained "I usually hear somebody calling my name or yelling out my name."  (R. 54.)  He also said that he sees things and then realizes they are not there.  (*Id.*)

When asked whether he had problems with panic, Plaintiff responded that he usually had four to seven panic attacks per week and each lasted from one to three hours.  (R. 54.)  Plaintiff testified that he spends most of his day in his room because he thinks someone is looking at him or watching him when he is in other parts of the house.  (*Id.*)

Regarding right shoulder problems which resulted from a work injury in 2010 or 2011, Plaintiff said he had pain toward his neck and down to his lower back if he lifted his hand very far.  (R. 55, 57.)  He added that he took pain medication but it gave him diarrhea, he continued to have constant pain, and other treatments, including physical therapy and injections, had not helped.  (R. 55-56.)

Plaintiff was wearing wrist splints at the hearing and described his carpal tunnel

pain as 10/10 without medication and 8/10 with it.  (R. 56.)  He said he dropped things often and had trouble with buttons, zippers, and ties.  (R. 57.)

Plaintiff testified that he had headaches five days a week which lasted all day. (*Id.*)  He said they were aggravated by light so he stayed in a dark room.  (*Id.*)

Upon further questioning about his work-related right shoulder injury, Plaintiff confirmed that he had not been back to work since then, adding "even if I want to work, most people, they don't want to pick me because of the condition, because of the health conditions I am in right now."  (R. 57-58.)

## D. ALJ Decision

In his November 16, 2016, Decision, ALJ Cutter found that Plaintiff had the following severe impairments: headaches, bilateral carpal tunnel syndrome, osteoarthritis/tendonitis of the right shoulder, degenerative disc disease of the cervical spine, depression, and anxiety.  (R. 18.)  He noted that all other impairments were non-severe, including obesity.  (R. 19.)   He next determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  (*Id.*)

As related to Plaintiff's listing objection (Doc. 16 at 1), ALJ Cutter specifically reviewed listings 12.04 and 12.06.  (R. 20.)   He concluded Plaintiff did not satisfy the criteria of "paragraph B" of the listings because his impairments did not result in two

of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (*Id.*) Specifically, he determined Plaintiff had mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence, or pace, and no episodes of decompensation which have been of extended duration. (R. 20-21.)

ALJ Cutter then found that Plaintiff had the residual functional capacity to perform light work

> except the claimant can continuously sit, stand, or walk and can frequently climb, balance, stoop, kneel, crouch and crawl. The claimant is a right handed individual. He is limited to no overhead reaching with the right arm and only occasional overhead reaching with the left arm. The claimant can frequently reach in all other directions and handle, finger, feel, push, and pull bilaterally. He can continuously use foot controls bilaterally. The claimant can perfrom routine, repetitive, one to two step tasks and frequently interact with the public, coworkers, and supervisors non-confrontationally. The claimant [can] perform ork involving occasional decision making or occasional changes in the work setting.

(R. 21.) Based on this RFC, the ALJ determined that Plaintiff was not able to perform past relevant work but jobs existed in significant numbers in the national economy that he could perform. (R. 26.) ALJ Cutter therefore concluded that Plaintiff had not been under a disability from February 23, 2013, through the date of the Decision. (R.

27.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v.*

---

[3]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

*Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy. (R. 26.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision.  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted).  If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the]

28

decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts

presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

As set out above, Plaintiff asserts the Acting Commissioner's determination should be remanded for the following reasons: 1) the ALJ did not properly consider listings 12.04 and 12.06; 2) the ALJ did not adequately consider limitations related to Plaintiff's severe impairments; 3) the ALJ did not afford appropriate weight to Plaintiff's treating provider's Mental Residual Functional Capacity Evaluation; 4) the ALJ failed to consider nine diagnosed medical conditions and the related limitations; 5) the ALJ erred by using GAF scores in assessing Plaintiff's residual functional capacity; 6) the ALJ did not consider side effects of medication; and 7) the ALJ did not consider the effects of Plaintiff's bilateral carpal tunnel syndrome. (Doc. 16 at 1-2.)

A.     ***Step Two***

Plaintiff's objection regarding nine medical conditions allegedly not considered

30

by ALJ Cutter (Doc. 16 at 25) is essentially an argument that the ALJ erred at step two of the sequential evaluation process. He states the ALJ did not identify whether the conditions were severe or non-severe and he did not consider limitations related to the disorders in terms of Plaintiff's residual functional capacity. (*Id.*) Plaintiff identifies the following conditions: sleep disorder, panic attacks, left shoulder pain, drowsiness, back pain, dizziness, stomach pain, migraine headaces, and fatigue. (*Id.* at 26.) The Court concludes Plaintiff has not satisfied his burden of showing that the claimed error is cause for reversal or remand.

First, Plaintiff is mistaken that the ALJ should have considered the listed problems to be severe or non-severe as the severity consideration relates only to medically determinable impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)ii. A medically determinable impairment can only be diagnosed by an acceptable medical source. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2); SSR 06-03P, 2006 WL 2329939, at *2. The regulations clearly differentiate between medically determinable impairments and symptoms, and the alleged symptom must be related to a diagnosed medically determinable impairment to be considered to affect the claimant's ability to do basic work activities. *See*, *e.g.*, 20 C.F.R. §§ 404.1529(b), 416.929(b).

Here Plaintiff produces a list of symptoms without reference to diagnosed

medically determinable impairments.  He therefore does not show step two error or related RFC error.  Further, as will be discussed below, many of the symptoms listed were noted in the ALJ's explanation of his RFC assessment and credibly established limitations were included in the RFC.

**B.**     ***Step Three Listings 12.04 and 12.06***

Plaintiff maintains the ALJ erred in concluding he did not meet listings 12.04 and 12.06 at step three of the sequential evaluation process.  (Doc. 16 at 11-15.) Defendant responds that substantial evidence supports the ALJ's decision at step three.  (Doc. 19 at 6-9.)  The Court concludes Plaintiff has not satisfied his burden of showing the claimed error is cause for reversal or remand.

Plaintiff's argument related to the "paragraph B" criteria of the listings is extremely limited: he states he "clearly has demonstrated marked limitations in the areas of activities of daily living and concentration persistence or pace." (Doc. 16 at 13, 15.)  In support of this conclusion, Plaintiff points to the Psychiatric Evaluation conducted on September 13, 2013, where Plaintiff confirmed issues such as hallucinations, lack of energy, feelings of worthlessness and hopelessness, appetite disturbance, sleep disorder, impaired attention and concentration, depressed mood, and blunted affect.  (*Id.* at 13 (citing R. 473-75).)

Plaintiff's reliance on his self-reporting at his initial psychiatric visit (*see* R.

473-75) is inadquate to show that the ALJ erred in his paragraph B listing evaluation. ALJ Cutter explained the bases for each of his findings.  (R. 20-21.)  In the absence of specific argument undermining the ALJ's rationale, the Court concludes Plaintiff has not satisfied his burden of showing that ALJ Cutter's conclusion regarding listings 12.04 and 12.06 is not supported by substantial evidence.

## C.    *Residual Functional Capacity*

## 1.    **Impairment Limitations**

Plaintiff alleges the ALJ did not adequately consider symptoms/limitations associated with his mental health impairments, carpal tunnel syndrome, neck pain, shoulder problems, and headaches.  (Doc. 16 at 17-19.)  Defendant responds that substantial evidence supports the RFC.  (Doc. 19 at 10.)  The Court concludes Plaintiff has not satisfied his burden of showing error related to any of the identified symptoms/limitations.

Because an ALJ must include only credibly established limitations in his RFC assessment, whether a limitation is credibly established is often the crux of the issue when a plaintiff complains inadequate consideration of a symptom/limitation. *Rutherford*, 399 F.3d at 554.  Case law and regulations[4] address when a limitation is

_____

[4]  *Rutherford* specifically identifies 20 C.F.R. §§ 416.945, 929(c) and 927(c) as relevant to the inquiry.  399 F.3d at 554.

credibly established.  *Id.*

> Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response (*Burns*, 312 F.3d at 123).  Relatedly, the ALJ may not substitute his or her own expertise to refute such record evidence (*Plummer*, 186 F.3d at 429).  Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible–the ALJ can choose to credit portions of the existing evidence but "cannot reject evidence for no reason or for the wrong reason" (a principle repeated in *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993); [20 C.F.R. § 416.]929(c)(4)).  Finally, limitations that are asserted by the claimant but lack objective medical support may possibly be considered nonetheless credible.  In that respect the ALJ can reject such limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it. ([20 C.F.R. § 416.](c)(3)).

399 F.3d at 554.

a.    *Mental Health Impairments*

Plaintiff first contends the ALJ did not note limitations related to his severe mental health impairment.  (Doc. 16 at 16-17.)   He cites Ms. Rebman's December 24, 2014, Mental Residual Functional Capacity Assessment as confirmation of the following: he has a limited prognosis; he has marked limitations regarding his abilities to perform activities within a schedule, maintain regular attendance, and be punctual;

he has a marked limitation in his ability to tolerate normal levels of stress; he would be off task 20% of the time; he would miss five to ten days a month; and he would be unable to manage symptoms consistently enough to maintain sustained employment. (Doc. 16 at 17.)  Plaintiff also relies on mental health treatment records, asserting they show consistent complaints during visits to T.W. Ponessa in 2013 and 2014 related to hallucinations, trouble sleeping, trouble with concentration, decreased energy, and medication side-effects.  (Doc. 16 at 17.)

A limitation identified in a provider's opinion is not a confirmation that the limitation is credibly established--in the legal framework set out above, medical support and consistency of the evidence regarding the limitation are the key considerations.  *See Rutherford*, 399 F.3d at 5554.  ALJ Cutter reviewed Ms. Rebman's Mental Residual Functional Capacity Assessment and found it entitled to limited weight because certain aspects of the opinion were not consistent with assessed functional limitations and the longitudinal treatment record.  (R. 24.) Because Plaintiff's assertion that limitations found in the opinion should have been included in the RFC relates to the propriety of the ALJ's determination regarding the weight afforded Ms. Rebman's opinion, the Court will first consider whether ALJ Cutter properly afforded the opinion limited weight.

Under applicable regulations and the law of the Third Circuit, a treating medical

source's opinions are generally entitled to controlling weight, or at least substantial weight.[5] *See, e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in

---

[5] For claims filed on or after March 27, 2017, 20 C.F.R. §§ 404.1520c, 416.920c control the consideration of medical opinions and prior administrative medical findings. Though not applicable here, the regulations have eliminated the treating source rule for claims filed after March 27, 2017, and in doing so have recognized that courts reviewing claims have "focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our decision." 82 FR 5844-01, 2017 WL 168819, *at 5853 (Jan. 18, 2017). The agency further stated that in its experience in adjudicating claims using the treating source rule since 1991, the two most important factors for determining persuasiveness are consistency and supportability, which is the foundation of the new regulations. *Id.* Therefore, the new regulations contain no automatic hierarchy for treating sources, examining sources, or reviewing sources, but instead focus on the analysis of these factors. *Id.*

your case, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).[6] "A

cardinal principle guiding disability eligibility determinations is that the ALJ accord

treating physicians' reports great weight, especially when their opinions reflect expert

judgment based on continuing observation of the patient's condition over a prolonged

period of time." *Morales*, 225 F.3d at 317 (citations omitted); *see also Brownawell v.*

*Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the

treating physician's assessment, an ALJ may not make "speculative inferences from

---

[6] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your
> treating sources, since these sources are likely to be the
> medical professionals most able to provide a detailed,
> longitudinal picture of your medical impairment(s) and may
> bring a unique perspective to the medical evidence that
> cannot be obtained from the objective medical findings
> alone or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations. If we
> find that a treating source's opinion on the issue(s) of the
> nature and severity of your impairment(s) is well-supported
> by medically acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the other substantial
> evidence in your case record, we will give it controlling
> weight. When we do not give the treating source's opinion
> controlling weight, we apply the factors listed in paragraphs
> (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in
> paragraphs (c)(3) through (c)(6) of this section in
> determining the weight to give the opinion. We will always
> give good reasons in our notice of determination or decision
> for the weight we give your treating source's opinion.

medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The record here does not indicate that Ms. Rebman, who has the designation "MS" (*see* R. 720), is an acceptable medical source whose opinion would be entitled to controlling weight. *See* 20 C.F.R. §§ 404.1502(a), 404.1527(a)-(c). Social Security Ruling 06-03p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006), clarifies how opinions from sources who are not "acceptable medical sources" are considered. *Id.* at *1. For example, only "acceptable medical sources" can give medical opinions, *id.* (citing 20 C.F.R. §§ 404.1527(a)(2) and 417.927(a)(2)), and only "acceptable medical sources" can be considered treating sources whose medical opinions may be entitled to controlling weight, *id.* (citing 20 C.F.R. §§ 404.1502 and 416.902). However, "[o]pinions from these medical sources who are not technically deemed 'acceptable medical sources' . . . are important and should be evaluated on key issues such as impairment severity and functional effects." 2006 WL 2329939, at *3. The factors considered in the evaluation of opinions from "acceptable medical sources" as identified in 20 C.F.R. §§ 404.1527(d) and 416.927(d) can also be applied to "other

source" opinions. 2006 WL 2329939, at *4-5.

In this scheme, Plaintiff is incorrect that Plaintiff's opinion was entitled to controlling weight (Doc. 16 at 24). However, Ms. Rebman's opinion was entitled to consideration, 2006 WL 2329939, at *3, and ALJ Cutter properly did so, explaining his reasons for assigning the opinion limited weight. (R. 24.) He did not find Ms. Rebman's opinion regarding marked limitations in maintaining punctuality and her finding of frequent absenteeism were supported by the record. (*Id.*) ALJ Cutter referenced his earlier findings of no more than moderate limitations in functioning and the record support for generally benign findings on mental status examination in support of his determination that Ms. Rebman's statements were not consistent with the longitudinal record. (R. 24; *see also* R. 20, 23 (citations omitted).) In his general analysis of mental impairment evidence, the ALJ noted that "[a]t times, depressed mood and affect were noted on examinations, however these were not marked or extreme in nature." (R. 23.) Regarding panic attacks, he observed that only a single panic attack was documented in the record which was inconsistent with Plaintiff's testimony that he had about seven panic attacks a week. (R. 23 (citations omitted).)

Plaintiff does not address the ALJ's rationale or take issue with his specific findings. Rather, he asserts the ALJ should have given the opinion controlling weight because "there is no evidence of record which largely conflicts with the treating

source opinion, and due to the factors to be considered in terms of the quality, nature and extent of the opinion, particularly as it relates to the length and frequency of contact between Claimant and the treating source." (Doc. 16 at 24.) This conclusory statement does not show error. As noted previously, Plaintiff does not attempt to undermine the rationale provided by ALJ Cutter. Plaintiff relies on his own testimony about mental health symptoms, but he does not point to medical evidence which supports his testimony or contradicts the evidence relied upon by ALJ Cutter. (Doc. 16 at 23-24.) In certain respects, Plaintiff's statement that his testimony was not taken into account (*id.*) is inaccurate. For example, Plaintiff says the ALJ did not consider his testimony that he had between four and seven panic attacks per week (Doc. 16 at 23-24), but ALJ Cutter specifically considered the testimony and he discounted it as inconsistent with the record (R. 23). Further, because ALJ Cutter pointed to evidence contradicting findings made in the opinion, even if Ms. Rebman were an acceptable medical source, the ALJ would have been entitled to assign her opinion less than controlling weight under the relevant regulatory provisions and the law of the Third Circuit. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Morales*, 225 F.3d at 317.

Because Plaintiff has not shown error in the ALJ's assignment of limited weight to Ms. Rebman's opinion, his reliance on the opinion as confirmation for numerous

limitations regarding absenteeism and punctuality is without merit. (*See* Doc. 16 at 17.) To the extent he relies on the opinion as support for his inability to tolerate normal stress levels, Plaintiff does not show how the RFC is inconsistent with his stress limitation. ALJ Cutter found "[t]he claimant can perform routine, repetitive, one to two step tasks and frequently interact with the public, coworkers, and supervisors non-confrontationally. The claimant [can] perform work involving occasional decision making or occasional changes in the work setting." (R. 21.) In that "performing a 'simple routine task' typically involves *low stress level* work," *Menkes v. Astrue*, 262 F. App'x 410, 412 (3d Cir. 2008) (not precedential) (emphasis added), ALJ Cutter did not assess Plaintiff capable of tolerating normal stress levels. Thus, Plaintiff cannot rely on Ms. Rebman's opinion to support his argument that the ALJ did not properly consider limitations associated with his mental health impairments. (*See* Doc. 16 at 17.)

Plaintiff also relies on his mental health records to show that he had ongoing issues with depression and anxiety, noting "[i]n particular, Claimant continually complained of issues with hallucinations, trouble sleeping, trouble with concentration, decreased energy and side effects from his prescription mental-health prescriptions, which was consistent with Psychiatric Evaluation in 2013 and 2014." (Doc. 16 at 17 (citing R. 763-788).) Despite these assertions, the Court concludes the records cited

do not provide the suggested support.

With specific citation to the record, ALJ Cutter noted that mental status examinations showed "benign findings including cooperative attitude, normal speech, normal thought content, fair insight and judgment, proper orientation, and intact memory, attention, and concentration." (R. 23 (citing Exs. B4F/18, 72, 78, 92; B6F/7; B8F/16, 20; B11F/21; B14F/26).) As explained above, Plaintiff does not refute ALJ Cutter's assessment of mental status examination findings. *See supra* p. 33. To the extent Plaintiff complains of consideration of alleged concentration problems, ALJ Cutter identified evidence contradicting Plaintiff's subjective complaints and, therefore, established a basis to find them not credibly established within the relevant legal framework. *See Rutherford*, 399 F.3d at 554.

Regarding other "issues" not specifically addressed by the ALJ, i.e., hallucinations, trouble sleeping, decreased energy, and medication side-effects, Plaintiff does not show how these problems present limitations not consistent with the RFC assessment. (*See* Doc. 16 at 17.) Though Plaintiff says that his subjective complaints were consistent (*id.*), he does not address the numerous occasions set out in the background section of this Memorandum where he did not complain of mental health symptoms. (*See* Doc. 16 at 17.) Further, Plaintiff does not show that the issues complained of caused limitations inconsistent with the RFC. For example,

Plaintiff states the ALJ did not take medication side effects into consideration but he does not identify those side effects in his brief. (*See* Doc. 16 at 17.) Notably, he testified at the ALJ hearing that he had side effects from medications but he was unable to remember what problems the medications caused or the names of the medications.[7] (R. 53.) Similarly, no evidence or argument points to limitations related to alleged hallucinations. Though the problem was noted by way of history, practical effects were not discussed. For example, when Dr. DeJesus saw Plaintiff for mental health follow up on August 24, 2015, Plaintiff reported auditory hallucinations of hearing his name called at nighttime as well as sleep problems and medication changes were agreed upon. (R. 783.) No subsequent records discuss these issues or related limitations. (*See* R. 843, 898.)

On this record, the Court cannot conclude that the ALJ erred by not including credibly established limitations in his RFC assessment. Therefore, Plaintiff's claimed error is not cause for reversal or remand.

b.    *Carpal Tunnel Syndrome*

Plaintiff next contends that limitations related to carpal tunnel syndrome were

---

[7]    In his response to the question about medication side effects, Plaintiff mentioned mental health symptoms such as hallucinations, hyperness, and anxiety. (R. 53.) He noted he was shaking at the time and that he had to go to the bathroom every time he took another medication. From this testimony, it is hard to decipher what are mental health symptoms and what are medication side effects. (R. 53.)

not properly addressed. (Doc. 16 at 18.) He points to hearing testimony where he reported wearing splints on both wrists and dropping things due to hand weakness (*id.* (citing R. 56-57)), records showing unimproved pain and weakness in his hands (*id.* (citing R. 688-89)), and EMG evidence confirming neuropathy in both hands (*id.*).

ALJ Cutter noted that the EMG performed in 2012 was before the alleged onset date and showed evidence of very mild carpal tunnel syndrome; the condition was later treated with a cock-up wrist splint, nonsteroidal inflammatories, and physical therapy; Plaintiff claimed the treatment measures did not alleviate the pain but he initially refused surgery; and he underwent surgery in December 2015. (R. 22.) Further, ALJ Cutter included limitations related to handling, fingering, feeling, pushing, and pulling in the RFC. (R. 21.)

Although Plaintiff lodged subjective complaints at the hearing (R. 56-57), the citation to treatment records does not provide support for limitations associated with carpal tunnel syndrome. Office notes cited indicate only that Dr. Gallo reported Plaintiff was being treated for carpal tunnel syndrome by Dr. Ingraham (R. 688), injection in the glenohumeral (shoulder) joint did not provide relief, a 2012 incident caused a tremor, numbness and tingling in his hands "at that time" (*id.*), and carpal tunnel or hand symptoms were not noted on physical exam or in the Assessment and Plan portion of the report (R. 688-89). Further, Plaintiff does not provide citation to

44

the referenced EMG studies or otherwise show limitations associated with neuropathy. (*See* Doc. 16 at 18.) Finally, Plaintiff does not discuss the related limitations established in the RFC or otherwise show how they are inadequate to address his subjective complaints.

On this record, the Court cannot conclude the ALJ failed to consider credibly established limitations in his RFC assessment. Therefore, Plaintiff's claimed error regarding carpal tunnel syndrome limitations is not cause for reversal or remand.

c.     *Neck Pain*

In support of the alleged error related to neck pain, the only evidence from the relevant time period cited by Plaintiff is a May 2013 physical therapy evaluation which found that cervical repeated motion testing was poorly tolerated, compression test of the cervical spine was positive on the right, and Plaintiff had poor range of motion. (Doc. 16 at 18 (citing R. 632).) Plaintiff does not identify what limitations related to neck pain were not included in the RFC or show how the 2013 evaluation credibly establishes a limitation not addressed by ALJ Cutter's RFC assessment limiting Plaintiff to light work with added postural and nonexertional limitations.

On this record, the Court cannot conclude the ALJ failed to include credibly established limitations related to Plaintiff's neck pain. Thus, Plaintiff's claimed error on this issue is not cause for reversal or remand.

45

*d.    Shoulder Pain*

Plaintiff cites numerous studies and findings allegedly supportive of his assertion that ALJ Cutter did not properly assess limitations related to his shoulder pain.  (Doc. 16 at 18.)  However, he cites only one record from the relevant time period--an Outpatient Note dated July 5, 2013, from Dr. Gallo at HMC--which Plaintiff references in support of the statement that he reported pain in both shoulders which was not improved despite multiple injections although ALJ Cutter only focused on the right shoulder.  (Doc. 16 at 18 (citing R. 434-35).)   The cited record contains no reference to left shoulder pain or limitation.  (See R. 434-35.)  Therefore, to the extent Plaintiff contends the ALJ erred by not providing a credibly established limitation related to his left shoulder, his claim fails.  Further, Plaintiff does not identify any particular limitation which was not addressed by the ALJ.  Importantly, ALJ Cutter provided for limitations related to shoulder problems including no overhead reaching with the right arm, occasional overhead reaching with the left arm, frequent reaching in all other directions, and frequent pushing and pulling bilaterally. (R. 21.)  Plaintiff does not attempt to show why these limitations are not consistent with credibly established limitations of record.  Therefore, his claimed error on this issue is not cause for reversal or remand.

*e.    Headaches*

In support of his argument that ALJ Cutter did not properly assess limitations related to his headaches, Plaintiff provides a single citation to the record--his testimony at the hearing that he gets headaches every day which are made worse by light. (Doc. 16 at 19 (citint R. 57).)

ALJ Cutter reviewed evidence related to Plaintiff's headaches, including office records from 2014 in which Plaintiff reported the headaches were becoming more frequent but were helped with medication. (R. 23 (citing R. 501).) The ALJ noted Plaintiff did not report headaches during the review of his symptoms at office visits in 2015 and 2016 although he testified that he got headaches five times a week at the September 2, 2016, hearing. (R. 23 (citations omitted).)

Plaintiff does not address ALJ Cutter's review of evidence related to headaches. Importantly, he does not refute the inconsistency between his hearing testimony complaining of frequent severe headaches and the lack of complaints at office visits during the time preceding the hearing.

On this record the Court cannot conclude the ALJ failed to include credibly established limitations related to headaches in his RFC. Therefore, Plaintiff has not shown his claimed error on this issue is cause for reversal or remand.

f.    *Function Reports*

Finally, Plaintiff points to his Function Report and the Third Party Function

47

Report completed in this matter. (Doc. 16 at 19-20.) From his own report, Plaintiff cites reports of pain, panic attacks, depression, difficulty sleeping, numbness in his arms, the assistance provided by his wife in dressing and grooming, the fact that he does not do chores, limited activities, difficulty with instructions, and medication side-effects—all of which he says are consistent with the testimony and medical records. (*Id.* at 19.) He cites similar reports found in the Third Party Function Report, noting their consistency with his report, his testimony, and medical records. (*Id.* at 20.)

What Plaintiff does not do is show how this litany of difficulties results in credibly established limitations which were not addressed by the ALJ and not accounted for in the RFC. Throughout his brief, Plaintiff provides only conclusory statements in alleged support of his claimed errors. As discussed above, he does not directly refute ALJ Cutter's functional assessments at step three of the evaluation process and he does not provide the necessary showing as to any allegation related to a specific impairment with the claimed RFC limitation error. As Plaintiff retains the burden of showing error through the RFC portion of the sequential evaluation, the Court cannot find error with only vague assertions and conclusory allegations provided in support.

## 2.    Mental Residual Functional Capacity Evaluation

The foregoing discussion establishes that Plaintiff has not shown his claimed

error related to ALJ Cutter's assessment of Ms. Rebman's opinion is cause for reversal or remand.

### 3. Carpal Tunnel Syndrome

Plaintiff asserts an independent objection related to carpal tunnel syndrome in addition to the RFC-limitation objection discussed above. (Doc. 16 at 30.) Review of this objection does not reveal any basis to alter the conclusion that Plaintiff has not shown that ALJ Cutter erred in his assessment of the impairment and associated limitations. The Court further notes Plaintiff is incorrect that the RFC contains no limitations regarding use of his hands, pushing, pulling, and manipulation (*see* Doc. 16 at 30): ALJ Cutter limited Plaintiff to frequent handling, fingering, feeling, pushing, and pulling bilaterally (R. 21).

### 4. Medication Side Effects

As with carpal tunnel syndrome, Plaintiff presents a specific error related to medication side-effects (Doc. 16 at 29) having raised the issue of limitations related to side effects in a previous claimed error, *see supra* pp. 40-41. After listing thirteen medications he was taking as of December 18, 2015, Plaintiff states that he provided testimony to confirm side effects and noted the same side effects in his Function Report. (*Id.* (citing R. 53, 56, 277, 279, 304).) Plaintiff avers that the evidence supports medication side effects of dizziness, sleepiness, diarrhea, nausea and upset

49

stomach which occurred on a daily basis and had an effect on his need to take unscheduled breaks, his work attendance, and his ability to remain on task. (Doc. 16 at 30.)

Review of the evidence cited shows it does not provide the support suggested. In the Function Report dated August 28, 2014, Plaintiff reported that Gabapentin caused dizziness and sleepiness, Abilify caused diarrhea, Sumatriptan caused dizziness, and Meloxican caused nausea and stomach pain. (R. 277; *see also* R. 279.) In the December 18, 2015, list of current medications, of the four medications identified on August 28, 2014, Plaintiff was taking only Sumatriptan which he had said caused dizziness. (R. 303.) As discussed above, Plaintiff testified at the ALJ hearing that he had side effects related to the medications he took for his mental health problems but he did not remember what the problems were and his response to the question about side effects did not clarify the issue. (*See* R. 53.[8])

This review of the record shows that Plaintiff has provided no competent evidence that he suffers from daily debilitating side effects: his testimony is vague (R. 53); several of the medications which he alleged caused side effects in August 2014 had been discontinued as of December 2015 (R. 277, 303); and Plaintiff points to no

---

[8] The Court finds no testimony about medication side effects at R. 56 as cited by Plaintiff. (*See* Doc. 16 at 29.)

evidence to support claims of ongoing daily side effects which should have been considered by the ALJ (*see* Doc. 16 at 29-30). Therefore, Plaintiff has not satisfied his burden of showing the claimed error is cause for reversal or remand.

**5.    GAF Scores**

Plaintiff maintains the ALJ erred in considering GAF scores when assessing Plaintiff's RFC. (Doc. 16 at 27.) Defendant responds that there is no merit to this argument because, in this case, Plaintiff's consistent GAF scores are more probative than usual and the GAF scores were just one factor considered. (Doc. 19 at 13-14.) The Court concludes Plaintiff has not shown that the claimed error is cause for reversal or remand.

"GAF scores do not have a 'direct correlation to the severity requirements' of the Social Security mental disorder listings." *Rios v. Comm'r of Soc.* Sec., 444 F. App'x 532, 535 (3d Cir. 2011) (not precedential) (quoting 65 Fed. Reg. 50746-01, 50764-65 (2000)). "They are only medical evidence that informs the Commissioner's judgment of whether an individual is disabled." *Id.* (citing *Watson v. Astrue*, Civ. A. No. 08-1858, 2009 WL 678717, at *5 (Mar. 13, 2009)). Thus, while the significance and use of GAF scores has been debated since the GAF scale was eliminated form the Diagnostic and Statistical Manual of Mental Disorders, an ALJ is not precluded from considering GAF scores as opinion evidence. *See*, *e.g.*, *Forster v. Colvin*, Civ. A. No.

3:13-CV-2699, 2015 WL 1608741, at *9 & n.2 (M.D. Pa. Apr. 10, 2015) (citations omitted). However, as noted in *Rios*, an ALJ may not "cherry-pick[]" or ignore assessments that run counter to a finding when considering GAF scores. 444 F. App'x at 535 (citations omitted).

Here ALJ Cutter did not cherry-pick GAF scores or ignore assessments that ran counter to the GAF scores ranging between 50 and 55 that are found throughout the record. (*See* R. 24.) The ALJ explained his consideration of the scores and compared the "snapshot" nature of many scores that are of limited evidentiary value to the scores in this case where the GAF scores were issued by a number of physicians over a period of years and the scores remained tightly grouped. (*Id.*) In these circumstances, ALJ Cutter assessed the scores to be more probative than usual and found them indicative of the moderate symptoms noted in the progress records. (*Id.*)

Plaintiff does not directly address ALJ Cutter's analysis and apparently misinterprets relevant authority regarding the use of GAF scores when he criticizes the ALJ's assessment as running counter to Social Security directives. (*See* Doc. 16 at 28.) Contrary to Plaintiff's contention that ALJ Cutter used the scores to "raise [Plaintiff's] level of functioning" (*id.*), the ALJ gave weight to the scores because he found them consistent with the records regarding Plaintiff's symptoms. (R. 24.) On this record, Plaintiff shows no error in the use of GAF scores by ALJ Cutter.

Therefore, he has not shown that this claimed error is cause for reversal or remand.

## **V. Conclusion**

For the reasons discussed above, the Court concludes Plaintiff's appeal is properly denied. An appropriate Order is filed simultaneously with this Memorandum.


_____
JOHN E. JONES
United States District Judge

DATED: _____